THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TAMMY L. EVEANS, a/k/a Tammy L. Corbett, Defendant-Appellant.

Fourth District    No. 4—93—0354

Argued April 19, 1995.—Opinion filed January 4, 1996.

Daniel D. Yuhas and Arden J. Lang (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Vince Moreth, State's Attorney, of Carlinville (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

After a bench trial, defendant Tammy Eveans, a/k/a Tammy Corbett, was convicted of four counts of murder, a violation of section 9—1 of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1 (now 720 ILCS 5/9—1 (West 1992))). She was sentenced to two concurrent terms of natural life imprisonment and now appeals her conviction. We affirm in part and vacate in part.

## I. BACKGROUND

Defendant was charged with four counts of murder of two of her children, Robert Eveans (born July 31, 1987, and died September 25, 1987) and Amy Cecille Eveans (born August 16, 1988, and died September 1, 1988). At the time of trial defendant had already been convicted of murdering her oldest child, Ricky, whose death prompted authorities to reexamine the earlier deaths and charge defendant with murder. Defendant pleaded not guilty to two counts alleging she intentionally or knowingly caused their deaths and two counts alleging she engaged in conduct knowing it created a strong probability of their deaths.

Prior to the bench trial, defendant moved to suppress statements she made to Jersey County Sheriff Frank Yocom. At the suppression hearing, Sheriff Yocom testified he was called to the jail because defendant was crying and requested to see him. On arrival, he advised her who her attorney was and she should talk to him. She replied she knew her rights and wanted to talk to Sheriff Yocom. He again told her she should be aware of her constitutional rights and she should talk to her attorney. She replied she had not been honest with the sheriff and Lieutenant Wayne Watson of the Illinois State Police, and wanted to get some "things off her chest" about Robert and Amy. She wanted a meeting the next morning with her attorney, Sheriff Yocom, and Lieutenant Watson. She said she had not been perfectly honest with her attorney and wanted to "get all of this out in the open." Sheriff Yocom asked no questions. She made these statements on her own. The meeting never transpired. No other evidence was presented. The trial court denied the motion to suppress, finding defendant's statements were voluntary and self-initiated.

Defendant, asserting the marital privilege, also moved to suppress testimony from her former husband concerning admissions to him she killed their two children. The trial court denied the motion. At the bench trial, the following testimony and evidence were adduced.

Richard Eveans (Richard) was the former husband of defendant. Together they had three children, Ricky, Robert, and Amy Cecille, in

order. While he was away on a trip, defendant called and told him she was in the basement doing laundry and Robert had either fallen or their son Ricky had pulled Robert off a table. A few days later, Richard returned home when Robert was admitted to the hospital because he had stopped breathing. Robert was hooked to a monitor and appeared to be breathing normally. Robert never had any trouble breathing before or after he was admitted to the hospital. Richard took off work for a few days to console defendant. The first day he went back to work, Robert died in the hospital.

At different times during their marriage, defendant gave three different versions of being raped when she was younger. First, she claimed before they were married, she had been raped by her boyfriend. Later she claimed she had been grabbed as she was getting into her car, dragged to an apartment, and raped by a man who looked vaguely familiar. Later her story was the same as the second version, except this time the rapist was a black man.

Their daughter Amy did not exhibit any medical problems prior to her death. On the morning she died, Richard and defendant were asleep when the alarm clock went off. Defendant jumped out of bed, ran into the baby's room "like she knew something was wrong," and yelled something was wrong with Amy. Richard went into the room and saw Amy was cold and stiff. After Amy's death, and while consoling defendant, he asked her why she jumped out of bed that morning. She replied she dreamed Amy's name was in place of Robert's name on his headstone in the cemetery, so when she awoke she ran to see if Amy was all right.

In April 1990, Richard visited defendant in the county jail. She admitted placing her hand over Robert's mouth and suffocating him, and placing her hand over Amy's mouth and suffocating her. Defendant said she laughed when she did this and could not understand why Richard had not awakened when she was killing Amy.

Richard never saw defendant act as other than a loving mother with their children and his daughter, who occasionally stayed with him and defendant. He noted on numerous occasions defendant thrashed around in bed with violent nightmares and he was unable to wake her.

William Davis met defendant while a fellow inmate in the Jersey County jail. She told him she placed a pillow over the face of her "other child" (apparently Robert) and killed the child. Defendant told him at least a dozen times what she had done and said, "there was no witnesses, so she couldn't go to jail." She also told him she had been raped when she was younger by a group of black men in an abandoned building.

Charles Enneian met defendant while a fellow inmate at the Jersey County jail. In a telephone conversation with her in the summer of 1990, she told him "when Amy and Robbie died, they both kicked their legs real hard like a little baby would kick their legs trying to swim in the water." Defendant also recounted a rape when she was younger by a white man who dragged her from her car to an apartment.

Debra Sinks also met defendant while in jail. In addition to two versions of the rape from her past, defendant told her she had contacted Sheriff Yocom because she wanted to confess and tell the truth about the deaths of her children. Sheriff Yocom then repeated his testimony from the suppression hearing.

Lynn Chism, an acquaintance of defendant, had a phone conversation with defendant in November 1989, while defendant was being held in jail. Chism told defendant she had "no doubt" defendant had killed Robert and Amy. Defendant started crying and said, "It was my hands. It wasn't me, it was my hands." However, when Chism yelled at defendant, "You killed Robbie," defendant answered, "No, Ricky." Defendant then said she "had nothing to do with killing Amy."

Dr. William Drake, a coroner's physician for Jersey County, performed an autopsy on Amy. She died from cardiorespiratory arrest due to anoxia (a lack of breathing). He considered this to be sudden infant death syndrome (SIDS) (a/k/a crib death) and had no evidence of "foul play" at the time. SIDS is "a failure to breathe for unknown reasons." Autopsy findings for SIDS and death by suffocation are indistinguishable in a tiny baby.

Brandie Eveans, 12 years old, is Richard's daughter and the stepdaughter of defendant. She lived with defendant for a time. She once saw defendant put her hand over Robert's mouth. He started shaking and kicking his legs. Brandie also saw defendant place her hand over Amy's mouth and Amy started kicking her legs. Brandie ran to her bedroom and hid because she was afraid defendant was "going to get her." Defendant also told Brandie yet another version of the rape incident. On the day Ricky died, Brandie heard defendant say to Ricky in a "loud" and "mean" voice something like, "you are going to die."

Gina Eveans was married to Richard's brother and was a friend of defendant. Defendant told Gina she had been in the basement doing laundry when Ricky pulled the tablecloth off the kitchen table, which pulled Robert down off the table. Ricky was 13 months old at the time and could not yet walk. When Gina went to defendant's house to get clothes for defendant and Ricky, there was no tablecloth

or blood on the floor. The second time Robert was taken to the hospital, Gina saw defendant lean over Robert and say, "Don't worry, baby, I got even." Gina also noted defendant had told her on numerous occasions she was going to get even with her husband, Richard, for being away from home so much.

Raj Nanduri, a forensic pathologist, performed an autopsy on Robert in September 1987 and determined the cause of death was meningitis. She later performed an autopsy on Ricky and was aware Amy had died of SIDS. Nanduri suggested the reinvestigation of the two earlier deaths. Meningitis is not always fatal, and the findings of Robert's autopsy were not inconsistent with death by suffocation. Suffocation in a small child usually leaves no traces, so almost every death of a small child is not inconsistent with suffocation.

Mary Case, a pathologist, reviewed the records of Robert and Amy. She believed Robert had only localized brain inflammation, not meningitis, and his cause of death was undetermined. A child his age, $7^1/2$ weeks, rarely shows signs of suffocation. SIDS is commonly accepted to occur only after the baby is at least one month old. Amy was 16 days old at death. A diagnosis of SIDS requires an investigation of family history. Her office prohibits the diagnosis of SIDS in a family where another child has already died of SIDS. Another child's death in the family is a suspicious detail preventing a clear diagnosis of SIDS. She explained in forensic pathology, because children often die in ways undetectable by a medical autopsy, the cause of death can be determined only through investigation of circumstances surrounding the death. Given all the circumstances surrounding Robert's and Amy's deaths, she would rule the cause of their deaths homicide.

During the defense case, the defense called numerous witnesses including members of defendant's family, as well as former high school friends, teachers, and co-workers of defendant. Their testimony can be summarized as follows. Defendant underwent a marked personality change in high school. In her freshman year, she was outgoing, involved in student activities, a straight "A" student, and president of the student council. By her junior year, she had become introverted and depressed, withdrew from student activities, and began to drink. Her grades slipped, and she did not graduate with her class. In high school, she had an abortion, received a head injury in an accident at the Young Men's Christian Association pool, and was involved in a car accident. After the accidents, she had headaches and blackouts, violent nightmares from which she could not be awakened, and unprovoked hysterical screaming fits, after which she also blacked out and could not remember what happened. In regard to parental affection and skills, she seemed a wonderful, loving mother.

Katherine Sears, defendant's mother, testified defendant claimed she was doing laundry in the basement when Ricky pulled Robert down from the kitchen table. However, Mary Corbett, defendant's sister, testified after Robert died, defendant said she was doing dishes in the kitchen when he fell. After Ricky's death, defendant said she was taking a nap with Ricky when she had a nightmare she was being raped. In trying to defend herself in her sleep, her body smothered Ricky.

Dr. Daniel J. Cuneo, a clinical psychologist with the Illinois Department of Mental Health and Developmental Disabilities, evaluated defendant. She told him she believed she killed her children because she had dreams and flashbacks of doing so. Dr. Cuneo believed defendant's pool and auto accidents caused brain damage, which amplified her negative personality traits caused by rape trauma. A substantial disorder of thought, mood, and behavior impaired her judgment. Defendant could appreciate the criminality of her conduct and was legally sane at the time of the alleged offenses. On cross-examination, Dr. Cuneo testified a medical report by Dr. Farid Karimi, upon which Dr. Cuneo had relied in part in forming his opinions, indicated defendant did not have brain damage. On redirect, Dr. Cuneo noted Dr. Karimi had not only agreed defendant was mentally ill, but believed she was legally insane. Later, the State moved to limit Dr. Karimi's opinion regarding defendant's sanity be admissible only to show the basis of Dr. Cuneo's opinion. Over objection, the trial court granted the motion.

The State offered some rebuttal witnesses out of order, including Virginia Budde, a former co-worker of defendant. When defendant was pregnant, she said she did not want the baby, and "this was going to be the last one, anyway; that she didn't have to worry about it." She stated "something along the line that if she was lucky, something about the baby she was carrying wouldn't be born, would be born with something wrong." Defendant objected because Budde's testimony was not rebuttal. The trial court overruled the objection.

The defense rested. The trial court ruled no evidence of insanity or provocation had been presented and then found defendant guilty but mentally ill on all four counts of murder. Defendant now appeals, raising numerous arguments for reversal.

## II. ANALYSIS

■ Defendant first argues the trial court erred in admitting the statements she made to her husband. A spouse may not testify against another spouse as to any conversation between them during marriage unless, among other things, "the interests of their child or

children or of any child or children in either spouse's care, custody or control are directly involved." (725 ILCS 125/6 (West 1992).) Defendant argues the trial court improperly admitted her statements to her husband because, since Robert and Amy were dead, no interest of theirs was involved in this case. Defendant cites *People v. Bartell* (1944), 386 Ill. 483, 54 N.E.2d 700, and *People v. Burton* (1981), 102 Ill. App. 3d 148, 429 N.E.2d 543, as support.

In *Bartell*, the Supreme Court of Illinois, without discussion, concluded the statutory marital privilege prevented a wife from testifying against her husband concerning statements he made regarding the paternity of their child, with whose murder he was charged. In *Burton*, the appellate court declared the statutory marital privilege did not apply where one spouse was charged with aggravated incest against a stepchild. *Burton* declined to follow *Bartell*, noting *Bartell* did not specifically address the question whether trial for the murder of a child is a case in which that child's interests are directly involved. *Burton* also noted its decision was not inconsistent with *Bartell*, because the child victim in *Bartell* was dead, and "any interest she had in seeing defendant tried for a crime died with her." *Burton*, 102 Ill. App. 3d at 152, 429 N.E.2d at 546.

■ Defendant's reliance on these cases is misplaced. The quoted language from *Burton* was *dicta*, and *Bartell* is over 50 years old and did not specifically address whether the child's interests were involved. The legislature has since broadened the scope of the child interest exception to include the interests not only of the children of the testifying and accused spouses, but also the interests of *any* children in their care, custody or control. When a child is murdered by a parent the State stands in its place to serve several continuing interests directly involved in a criminal prosecution of that parent for murder: the interest in seeing the murderer brought to justice, the interest in protecting other children from violent acts of physical abuse committed by the same defendant, and the interest in deterring similar behavior in other potentially abusive parents. To hold otherwise would create an anomalous result under the marital privilege statute, whereby a spouse could testify when the other spouse admitted to *attempting* to murder their child, but not when the other spouse admitted to *succeeding* in murdering their child.

The purpose of the marital privilege to preserve marital harmony is not served by applying it here. When a spouse admits to the other spouse the killing of their child, there is no marital harmony left to preserve. There is no legislative history to guide us in construing the child interest exception, but privileges are strictly construed because they interfere with the truth-seeking process. (*In re Marriage of*

*Daniels* (1992), 240 Ill. App. 3d 314, 607 N.E.2d 1255.) A logical corollary is any exception to a privilege should be broadly construed. The State has a *compelling* interest in child welfare (*In re P.F.* (1994), 265 Ill. App. 3d 1092, 1103, 638 N.E.2d 716, 724), so the child interest exception should be construed broadly to afford the greatest protection to children rather than to the abusive or murderous spouse.

We also read the child interest exception as applying when either spouse has the care, custody, or control of any child not only at the time of trial, but also *at the time of the offense.* Otherwise, the same anomalous result would occur. A spouse could testify when the other spouse admitted to *attempting* to murder their child, because the child would presumably still be in the care, custody, or control of the innocent spouse. However, the innocent spouse could not testify when the other spouse admitted to *succeeding* in murdering their child, under the theory a dead child is no longer in anyone's care, custody, or control. We interpret the child interest exception to avoid such an absurd result by considering the paramount concern of the child interest exception: the welfare of the children. This interpretation comports with the logic and purpose behind the marital privilege statute. Once a spouse has committed an abusive act against a child, the damage to marital harmony has already been done. It makes no sense to reassert the marital privilege simply because custody over an abused child no longer resides in either parent at the time of trial. The trial court did not err by allowing the testimony of defendant's former husband.

Defendant next argues the trial court erred in admitting defendant's statements to Sheriff Yocom. Under the fourth amendment, once a defendant is in custody and asserts the right to counsel, the police are prohibited from engaging in words or actions "the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1979), 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct 1682, 1689-90.) However, volunteered statements are not prohibited by the fourth amendment and are admissible. (*People v. Jackson* (1992), 233 Ill. App. 3d 1089, 1099, 599 N.E.2d 1192, 1200, citing *Miranda v. Arizona* (1966), 384 U.S. 436, 478, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.) Under the sixth amendment, after the initiation of court proceedings against a defendant and an assertion of the right to counsel, the police are prohibited from interrogating that defendant, but self-initiated statements are admissible. (*People v. Pollard* (1986), 149 Ill. App. 3d 434, 443-44, 500 N.E.2d 971, 977, citing *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1044-45, 77 L. Ed. 2d 405, 411-12, 103 S. Ct. 2830, 2834.) A reviewing court will not disturb a trial court's determination on a

motion to suppress evidence unless it is against the manifest·weight of evidence. *People v. Bernasco* (1990), 138 Ill. 2d 349, 368, 562 N.E.2d 958, 966.

■ Defendant argues her statements to Sheriff Yocom are inadmissible because he initiated the conversation with her without readmonishing her of her rights before questioning her, citing *People v. Olivera* (1995), 164 Ill. 2d 382, 647 N.E.2d 926. The uncontroverted evidence shows her statements were not made in response to any question or comments. Defendant initiated and perpetuated the conversation and showed a willingness to talk about the deaths of her children even in the face of repeated admonishments by Sheriff Yocom that she had an attorney and should speak to him and should not talk to the sheriff. Simply put, defendant initiated the contact, was not interrogated, was fully aware of her rights, and insisted on talking about her getting some things off her chest. The concerns present in *Olivera* as to a police failure to readmonish a defendant before making comments likely to elicit incriminating remarks are simply not present here. *Olivera* does not assist defendant, and her statements were properly admitted.

Defendant then asserts her statements should be suppressed because her mental illness rendered her statements involuntary. At the suppression hearing, defendant made no such claim and offered no such evidence. Even if defendant was mentally ill at the time of her statements, we will not exclude evidence if its suppression would not serve the purpose of the exclusionary rule in deterring police misconduct. (*People v. Turnage* (1994), 162 Ill. 2d 299, 307, 642 N.E.2d 1235, 1239.) That purpose would not be served here, because there is no evidence of misconduct on the part of Sheriff Yocom. The trial court's ruling admitting defendant's statements to Sheriff Yocom was not against the manifest weight of evidence.

■ Defendant next argues the trial court erred by limiting the relevancy of Dr. Karimi's opinion defendant was insane. Defendant asserts the State, during cross-examination of Dr. Cuneo, gave Dr. Karimi's report the weight of substantive evidence and somehow opened the door for the defense to admit Dr. Karimi's insanity conclusion as substantive evidence. This argument is without merit. The contents of reports relied upon by experts are inadmissible as hearsay if offered for the truth of the matter asserted, but are admissible for the limited purpose of explaining the basis for the expert's opinion. (*People v. Pasch* (1992), 152 Ill. 2d 133, 176, 604 N.E.2d 294, 311.) If an expert admits relying upon a report, that party may be impeached with the contents of that report. (*Pasch*, 152 Ill. 2d at 178, 604 N.E.2d at 312.) Here, during cross-examination, the State permissibly ex-

plored the bases for Dr. Cuneo's opinions, and then impeached those opinions by noting Dr. Cuneo's conclusions conflicted with Dr. Karimi's conclusions. On redirect, the defense permissibly rehabilitated Dr. Cuneo's credibility by noting other of Dr. Karimi's conclusions agreed with Dr. Cuneo's conclusions. Dr. Karimi's report was not substantive evidence. His report could be used *only* to show the basis for Dr. Cuneo's opinions.

■ Defendant next asserts the trial court erred in failing to consider evidence supporting a finding of second degree murder. Sections 9—2(a)(1) and (a)(2) of the Code state a person commits second degree murder when:

> "(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

> (2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." (720 ILCS 5/9—2(a)(1), (a)(2) (West 1992).)

Self-defense is a justifying or exonerating circumstance. (720 ILCS 5/7—1 (West 1992).) Also, section 9—2(b) of the Code declares "[s]erious provocation is conduct sufficient to excite an intense passion in a reasonable person." (720 ILCS 5/9—2(b) (West 1992).) The only categories of serious provocation which have been recognized are substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. (*People v. Chevalier* (1989), 131 Ill. 2d 66, 71, 544 N.E.2d 942, 944.) Defendant argues at the time of both Amy's and Robert's deaths, their crying constituted provocation which triggered the unreasonable belief she was being raped, and she killed her children in a delusional attempt at self-defense. Defendant's argument is without merit. A crying baby is not provocation to murder and there was *no* evidence at trial that at the time of Amy's and Robert's deaths she had the belief she was being raped. It was only during Ricky's death she has claimed to have had such a belief. The trial court did not err in failing to consider evidence supporting second degree murder, because there was no such evidence.

■ Defendant next argues the trial court erred by allowing Virginia Budde to be called by the State as a rebuttal witness. Evidence offered in rebuttal is admissible if it tends to explain or disprove the testimony of the accused. The decision to admit rebuttal testimony will not be reversed absent an abuse of discretion by the trial court.

(*People v. Buehler* (1994), 261 Ill. App. 3d 539, 543, 636 N.E.2d 769, 772.) An abuse of discretion occurs where the rebuttal testimony contradicts testimony on a collateral issue, *i.e.*, if it has no relevance to a matter of consequence in the action as defined by the pleadings. (*People ex rel. Mendez v. Villa* (1994), 260 Ill. App. 3d 866, 870, 632 N.E.2d 322, 325.) Defendant asserts Budde's testimony was collateral. Defendant is wrong. Several defense witnesses testified defendant was a wonderful, loving mother, implying she had no motive to kill her children. Budde's testimony rebutted this testimony, indicating defendant was not necessarily so loving and possibly did have a motive for killing her children. The trial court did not abuse its discretion in allowing Budde's testimony.

■ Defendant also asserts she was prejudiced because the State did not disclose Budde as a witness. This argument is without merit. The State need not inform the defense of its intention to call a rebuttal witness until that intention is formed. (*People v. Weber* (1994), 264 Ill. App. 3d 310, 315-16, 636 N.E.2d 902, 906.) Budde had first been contacted by the police the night before her testimony. The State had not formed the intention to call her as a witness until that time and could not have given the defense any more notice.

■ Defendant next contends she was not proved guilty beyond a reasonable doubt. When presented with a challenge to the sufficiency of the evidence, a reviewing court will sustain a criminal conviction if " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) Defendant argues causation, one of the elements of murder, was not proved because no medical evidence in Robert's and Amy's bodies specifically indicated "foul play." Defendant's argument is without merit.

> "The *corpus delecti* of an offense has been defined as the occurrence of the injury or loss and its causation by criminal conduct. *** [T]he prosecution must present evidence apart from the defendant's own statements that tends to show the commission of the offense and that corroborates the facts related in the statement. ***
>
> > '[I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delecti*. In such event, the independent evidence need not establish be-

yond a reasonable doubt that an offense did occur.' "
(Emphasis in original.)

> (*People v. Howard* (1991), 147 Ill. 2d 103, 126-27, 588 N.E.2d 1044, 1052-53, quoting *People v. Willingham* (1982), 89 Ill. 2d 352, 361, 432 N.E.2d 861, 865.)

Defendant admitted she killed her children to several people on different occasions. The medical evidence alone did not prove suffocation beyond a reasonable doubt, but it corroborated defendant's statements and tended to show the commission of the offenses. Robert's and Amy's deaths were consistent with suffocation, and Dr. Case testified her office refuses to classify more than one infant death per family as SIDS because a previous SIDS child death in the family is suspicious. Here, not just two but *three* of defendant's children had died. The evidence was sufficient for a rational trier of fact to find defendant guilty beyond a reasonable doubt of the murders.

■ Defendant finally argues the trial court improperly found her guilty of four counts of murder instead of two. The State concedes a defendant may not be convicted for more than one offense arising out of the same physical act. (*People v. King* (1977), 66 Ill. 2d 551, 566, 363 N.E.2d 838, 844.) The defendant should have been convicted only on the two counts of intentional or knowing murder. The convictions for murder based on knowledge of a strong probability of her children's deaths are vacated.

The trial court's judgment is affirmed in all other aspects.

Affirmed in part; vacated in part.

STEIGMANN and McCULLOUGH, JJ., concur.