2021 IL App (1st) 153134-U

No. 1-15-3134

June 16, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 16022 |
| | ) | |
| YOHN ZAPADA, | ) | Honorable |
| | ) | Clayton Jay Crane, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE HOWSE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

ORDER

¶ 1     *Held*:  We reverse the circuit court's denial of defendant's *pro se* motion for leave to file a successive postconviction petition and remand for further proceedings under the Post-Conviction Hearing Act where defendant presented a colorable claim of actual innocence.

¶ 2     Following a bench trial, defendant Yohn Zapada was convicted of first degree murder of Omar Brown and ultimately sentenced to 48 years' imprisonment.[1] In 2015, defendant filed a *pro se* motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), alleging actual innocence based on newly discovered evidence. The circuit court denied leave to file the successive petition. We affirmed, finding that defendant failed to present a colorable claim of actual innocence because the affidavits defendant attached in support of his motion were neither newly discovered nor so conclusive they would probably change the result on retrial. *People v. Zapada*, 2019 IL App (1st) 153134-U.

¶ 3     On September 30, 2020, our supreme court denied defendant's petition for leave to appeal but directed this court to vacate our judgment and reconsider the matter in light of *People v. Robinson*, 2020 IL 123849, to determine whether a different result was warranted. *People v. Zapada*, No. 124717 (Ill. Sept. 30, 2020) (supervisory order). After reconsideration in light of *Robinson*, we find that defendant has presented a colorable claim of actual innocence, and we reverse the circuit court's judgment and remand for further proceedings under the Act.

¶ 4     We set forth the facts of the case in defendant's direct appeal (*People v. Zapada*, 347 Ill. App. 3d 956 (2004), and we recite them here to the extent necessary to our disposition.

¶ 5     The defense theory of the case was that defendant shot Brown in self-defense and lacked the requisite intent to kill him. At trial, Conan Little, Brown's cousin, testified that, on June 17, 2001, he was with Brown and Raphael Vega. The three men were going to a Father's Day party that evening. The men and Little's father left the party around 11:15 p.m. in Brown's gray vehicle.

---

[1] Defendant's name is also spelled as "Zapata" throughout the record. We use defendant's own spelling.

They drove to a building on Shakespeare Avenue where Brown and Little resided. Brown parked in the alley next to his building. Brown and Little went inside the building and returned to the car shortly thereafter.

¶ 6     Brown entered the driver's seat and Vega and Little sat in the backseat. When Brown pulled away from the building to allow Little's father to enter the front passenger seat, a man that Little knew as "Coli" walked up and "banged on the hood of the car." Little identified defendant in court as "Coli." Defendant was with five or six other people. When defendant approached the vehicle, he said "some negative words," pounded the hood, and punched and shattered the driver's side window.

¶ 7     Defendant started hitting Brown. Little was then pulled out of the car, and five or six men beat him up. Someone put Little in a headlock. While he was in a headlock, he saw defendant pull out a gun and shoot Brown twice. Both shots hit Brown. Defendant passed the gun to codefendant Alex Negron, who shot Brown three times.[2] Following the shooting, everyone ran. Several hours later, Little identified defendant and Negron in two separate lineups.

¶ 8     Rafael Vega corroborated Little's testimony regarding the events leading up to the shooting on June 17, 2001. Vega testified that when he, Brown, Little, and Little's father were getting into Brown's vehicle in the alley, a man called "Coli" ran up to the car. Vega later learned the man was defendant and went by the name "Coli," but did not know his name at the time. Vega did not know defendant on the day in question but had seen him "two or three times." He could not identify Coli in court.

---

[2] Defendant was tried in a separate, but simultaneous trial with codefendant Alex Negron, who is not a party to this appeal.

¶ 9        When defendant ran up to the car, he started banging on the hood. Brown pulled the car forward, and defendant ran around to the driver's side door and punched the window until it broke. Defendant then started hitting Brown. Vega noticed that Little was no longer in the car and observed "probably like three or four" men beating him up in the alley. Defendant was still hitting Brown, who was not fighting back.

¶ 10       Defendant's friend Danny attempted to open Vega's door. When Vega exited the vehicle, Danny grabbed his shirt. He did not see Danny in possession of a gun. Vega pushed Danny away and walked to the driver's side of the vehicle, where Brown was located. Vega pushed defendant off Brown, and defendant fell into the street. Vega then let Brown out of the car. Defendant stood up, pulled out a gun, and pointed it at Brown. Defendant shot twice at Brown's face. Brown screamed, and Vega attempted to walk him into the building.

¶ 11       Brown told Vega he could not walk and sat down in a grassy area in front of the building and next to the alley. Vega sat with Brown and saw defendant and Negron standing above them. Defendant gave the gun to Negron, who shot Brown "a couple times." Following those shots, Brown was no longer talking, and Vega ran into Brown's building. Negron followed him inside the building. Vega acknowledged that he originally told police that defendant had shot Brown after he was on the ground and then chased Vega into the building. But Vega clarified that he did not know their names at the time of the shooting and was not given an opportunity to correct his statement.

¶ 12       Vega later identified Negron and Coli as Brown's shooters in photographic arrays. He also identified Coli and Negron as the shooters in two separate lineups.

¶ 13    Dr. Adrienne Segovia, the medical examiner, testified as an expert in the field of forensic pathology. Brown's autopsy revealed evidence of four entry gunshot wounds. Three bullets were recovered from his body. In Dr. Segovia's opinion, Brown's death was a homicide, and he died as a result of multiple gunshot wounds. She could not say which specific gunshot killed Brown, because "[i]n a multiple gunshot wound case, all gunshot wounds are given equal weight."

¶ 14    Chicago police officer Antonio Hernandez testified he was an evidence technician. He photographed the crime scene on Shakespeare, where he observed broken auto glass and recovered a fired bullet. He also photographed a car in the alley that had a broken window.

¶ 15    Chicago police detective Arthur Young testified he was assigned to investigate Brown's homicide and was looking for defendant and Negron on June 18, 2001. He found and arrested Negron at a motel on Lincoln Avenue between 4 and 5 a.m. Inside the motel room, Young recovered a .38 caliber gun inside a drawer next to the bed and a clear plastic bag containing five shell casings.

¶ 16    Chicago police detective Tracy Fanning testified that, on June 18, 2001, he was looking for defendant during the course of his investigation into Brown's shooting. He arrested defendant at a building on the 2900 block of 21st Street. Fanning identified defendant in court.

¶ 17    The parties stipulated that forensic scientist John Flaskamp received the bullet fragment recovered from the alley, the three fired bullets recovered from Brown's body, and the gun and casings recovered at the motel in separate, sealed inventories. Flaskamp, an expert in firearms identification, if called, would testify that the three fired bullets recovered from Brown's body and the five spent casings recovered from the motel were all fired from the recovered gun. The bullet fragment was not suitable for comparison.

¶ 18    Defendant testified that, on June 17, 2001, he was at the lake for his daughter's birthday party until approximately 11:30 p.m. His daughter's mother drove him to Fullerton and Sacramento Avenues. Defendant walked toward Shakespeare and entered an alley. Upon entering the alley, Little, who was sitting in a car, said, "f*** you, b***." Defendant asked if Little was talking to him. Brown, who was also in the car, said, "yeah mother f***, what you going to do[?]" Defendant asked what the problem was, and Brown started the car "like he wanted to run [defendant] over." The car almost hit defendant. He moved and banged on the hood of the car. A van appeared in the alley and stopped behind Brown's car. Two men, Danny and Alex, were inside the van. Defendant said, "now there's [four] of you and I got two friends here, too." He later testified it was a coincidence that his friends were on the scene.

¶ 19    Brown attempted to open the door and use it to hit defendant. Defendant put his hands up and the window broke. Brown then grabbed defendant's hands and pushed him toward the car. In the scuffle, defendant cut his face and wrists. Defendant eventually freed himself from Brown's grip and the two men started fighting. Brown grabbed defendant's neck so hard that defendant could "barely breathe." Vega approached them and started hitting defendant. Defendant fell to the ground. Danny attempted to help defendant and was holding a gun. Brown approached defendant again, and defendant grabbed the gun from Danny's hand and shot at Brown twice to scare him. He handed the gun back to Danny and fled down the alley to a friend's house.

¶ 20    Defendant denied trying to kill Brown or shooting at his back. Defendant was scared for his life at the time because he could not breathe and did not know Brown's intentions. He denied chasing Vega or shooting at him. He also denied answering questions or giving a statement at the police station after he had been arrested. Defendant acknowledged his nickname is Coli.

¶ 21     In rebuttal, Detective Fanning testified that defendant told police he was at the beach for his daughter's birthday and then spent the night at his girlfriend's home on 21st Street the night of the shooting. Based on that conversation, Fanning went to 21st Street to speak to defendant's girlfriend. He then brought defendant's girlfriend to the police station to continue the investigation. Detective Johnson memorialized defendant's oral statement in writing. Fanning acknowledged that defendant's arrest report indicated that defendant refused to make either a written or oral statement. He clarified, however, that meant that defendant refused to make an oral or written statement to a State's Attorney.

¶ 22     Following arguments, the trial court found defendant guilty first degree murder. The court stated,

> "The credible evidence in this case suggests that this entire incident was started by [defendant]. He started banging on the car hood. He went to the window and started punching Omar Brown, broke the glass. It escalated from there. And I don't believe in coincidences that just at the very moment this is occurring, reinforcement arrive on the scene who all happen to know [defendant].
>
> The defendant's testimony was not truthful and in fact, I think it suggests it was concocted to support his purported defense of self defense in this case.
>
>                               * * *
>
> The evidence suggests that the defendant is a liar.
>
> This is not a whodunit, it's not a self defense case. He was the instigator, he shot at Omar Brown in this case."

¶ 23    The trial court subsequently sentenced defendant to 50 years' imprisonment, which included a 20-year firearm enhancement.

¶ 24    On direct appeal, defendant argued, *inter alia*, that the State failed to disprove that he acted in self-defense and the trial court improperly relied on her personal disdain for gang violence where there was no evidence that the murder was gang related. We affirmed defendant's conviction, finding the evidence sufficient to sustain his conviction, but vacated his sentence and remanded for resentencing. *Zapata*, 347 Ill. App. 3d 956.

¶ 25    On February 7, 2006, prior to his resentencing, defendant mailed to the trial court an initial *pro se* postconviction petition. The court dismissed his petition without prejudice because it was filed prior to resentencing. On remand, the trial court sentenced defendant to 48 years' imprisonment. Defendant appealed, and we affirmed his sentence and allowed counsel to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). *People v. Zapada*, No. 1-06-2493 (2008) (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 26    Defendant thereafter filed a *pro se* petition for postconviction relief on January 5, 2007. The trial court advanced the petition to second stage proceedings, and defendant retained private counsel, who amended the petition. Following the State's motion to dismiss, the trial court dismissed the petition on December 7, 2011. Defendant filed his notice of appeal on January 20, 2012, and, consequently, the trial court did not transmit his "late" notice of appeal to the appellate court. Defendant filed a *pro se* motion for leave to file late notice of appeal on April 20, 2012, which this court denied. *People v. Zapada*, No. 1-12-1134 (order of May 8, 2012).[3]

_____

[3] Although not contained in the record, defendant also filed a *pro se habeas corpus* petition pursuant to 28 U.S.C. § 2254 in the Northern District of Illinois. The federal district court denied defendant's petition and declined to issue a certificate of appealability. *United States ex rel. Zapada v.*

¶ 27 On June 22, 2015, defendant filed a *pro se* motion for leave to file a successive petition in which he alleged, as relevant here, a claim of actual innocence based on newly discovered evidence. In support of his actual innocence claim, defendant attached "affidavits" from Carmen Vasquez and Nicole McAtee, which were not notarized. He argued that the affidavits supported his claim of self-defense.

¶ 28 In her "affidavit," Vasquez stated that on June 17, 2001, at around midnight, she was with McAtee near an alley on West Shakespeare. She observed a gray car in the alley and noticed a man walk by the car. Vasquez recognized the man from "the area" and now knows him as defendant. The car sped up and attempted to hit defendant as he walked. Defendant "slammed his hands down on the front of the car" and jumped out of the way. The driver opened his door and hit defendant with it. As defendant raised his hands to avoid being hit by the door, the window shattered. Defendant appeared to have gotten glass in his eyes. Several men exited the vehicle and the driver put defendant in a "chokehold," while another man hit defendant until he fell to the ground. Another man appeared on the scene to help defendant. That man was holding a gun and was yelling, "Get off him." The driver again "tried to get at" defendant, and Vasquez then heard two gunshots, which sent everyone running. Vasquez did not think anyone had been shot so she got in a car with McAtee and left the scene. Recently, Vasquez was in the vicinity of Sacramento Avenue and Shakespeare and saw the flyer requesting information. When she spoke with McAtee about the flyer, the two women decided to contact the numbers listed on the flyer. McAtee's statement was substantially similar to Vasquez's.

---

*Lemke*, 2014 WL 1647126 (April 23, 2014). The federal court's order shows defendant argued that (1) the mandatory 20-year sentence enhancement for use of a firearm violated his constitutional rights to due process and equal protection; and (2) postconviction counsel was ineffective for failing to timely file a notice of appeal from the trial court's dismissal of his January 5, 2007, postconviction petition.

¶ 29    Defendant also attached to his petition a copy of the flyer that Vasquez and McAtee saw. It displays his own photograph and requests information related to "An Incident Which Occurred In Chicago At Approximately 11:40 P.M. or Thereafter On June 17th, 2001 In The Area Of Sacramento and Shakespeare (At the Alley on Shakespeare)."

¶ 30    On September 4, 2015, the trial court denied defendant's motion for leave to file a successive petition under the Act. With respect to defendant's actual innocence claim, the trial court found that Vasquez's and McAtee's affidavits did not constitute newly discovered evidence because they were merely cumulative of defendant's testimony at trial. The court also found that the affidavits were not conclusive evidence that defendant was innocent.

¶ 31    We affirmed the circuit court's denial, finding that defendant failed to present a colorable claim of actual innocence because the affidavits were not so conclusive that they would probably change the result on retrial. *Zapada*, 2019 IL App (1st) 153134-U, ¶¶ 38-39. On September 30, 2020, our supreme court denied defendant's petition for leave to appeal but directed this court to vacate our judgment and reconsider the matter in light of *Robinson*, 2020 IL 123849, to determine whether a different result was warranted. See *Zapada*, No. 124717 (Ill. Sept. 30, 2020) (supervisory order). Pursuant to the supreme court's order, we vacated our decision on January 7, 2021, and ordered supplemental briefing.

¶ 32    On appeal, defendant contends the trial court erred by denying his motion for leave to file a successive postconviction petition because he sufficiently stated a claim of actual innocence based on newly discovered evidence.

¶ 33    The Act permits criminal defendants to challenge their convictions or sentences on grounds of constitutional violations. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). However, the Act

generally contemplates the filing of only one petition. *People v. Ortiz,* 235 Ill. 2d 319, 328 (2009); 725 ILCS 5/122-3 (West 2014). In order to file a successive postconviction petition, a defendant must first obtain "leave of court." See 725 ILCS 5/122-1(f) (West 2014); *People v. Tidwell,* 236 Ill. 2d 150, 157 (2010).

¶ 34 The bar against successive proceedings is relaxed only where the defendant can satisfy (1) the cause and prejudice test of the Act for failing to raise the claim earlier; or (2) the "fundamental miscarriage of justice" exception, set forth as a claim of actual innocence. 725 ILCS 5/122-1(f) (West 2014); *People v. Edwards,* 2012 IL 111711, ¶¶ 22, 23. It is the defendant's burden to obtain leave of court before further proceedings on his successive postconviction claims can follow. *Edwards,* 2012 IL 111711, ¶ 24.

¶ 35 Where, as in this case, a defendant seeks to relax the bar against successive postconviction petitions on the basis of actual innocence, the court should deny such leave only when it is "clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Robinson*, 2020 IL 123849, ¶ 44. Stated differently, leave to file a successive petition based on actual innocence should be granted where the successive petition and supporting documentation "raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards,* 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). At the pleading stage, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. *Robinson*, 2020 IL 123849, ¶ 45. We review the circuit court's denial of leave to file a successive petition *de novo*. *Id.* ¶ 40.

¶ 36 To succeed on a claim of actual innocence, a petitioner must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington,* 171 Ill. 2d 475, 489 (1996)).

¶ 37 Newly discovered evidence is evidence that was discovered after trial that could not have been discovered sooner through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. Material evidence is evidence which is relevant and probative of the defendant's innocence. *Id.* Noncumulative evidence adds to the information that was presented to the fact finder at trial. *Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Molstad*, 101 Ill. 2d 128, 135 (1984)). Conclusive means "the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.* The conclusive character of the new evidence is the most important element of an actual innocence claim. *Robinson*, 2020 IL 123849, ¶ 47 (citing *Washington*, 171 Ill. 2d at 489). Ultimately, we must determine "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). The new evidence is not required to be "entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 38 Defendant contends that he should be permitted to file a successive postconviction petition based on Vasquez's and McAtee's affidavits. He claims the affidavits are newly discovered evidence because he could not have known that Vasquez and McAtee were witnesses to the shooting. He additionally claims the affidavits are material and noncumulative because they

"bolster" his trial testimony that he was not the initial aggressor in his altercation with Brown. He asserts that, on direct appeal, this court found the evidence against him was not overwhelming and the testimony was conflicting. Therefore, according to defendant, the two independent witnesses, Vasquez and McAtee, could have "tipped the balance" in favor of defendant's self-defense argument.

¶ 39    Here, taking the pleadings and supporting documents as true, as we must, we find the affidavits provide new, material, noncumulative evidence in support of defendant's claim of actual innocence. Defendant claimed he was unaware that Vasquez and McAtee were witnesses to the events preceding the shooting and had no way of knowing that until they came forward after seeing the poster with his photograph. Vasquez and McAtee stated they did not know anyone had been shot so they left the scene following the gunshots. Defendant, therefore, could not have discovered them earlier. See *e.g.*, *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 26 (finding affidavit constituted new evidence where the defendant did not know the affiant existed or was present at the scene and did not come forward until after trial).

¶ 40    Additionally, we find the affidavits are material and noncumulative. The State concedes the affidavits are material. The affidavits state that defendant was almost hit by a car and the driver opened his door in an effort to hit defendant. The driver placed defendant in a chokehold and then another man hit defendant. A man on the scene helping defendant was yelling "Get off him," and the driver again attempted to "get at" defendant. Then Vasquez and McAtee heard two shots. This evidence corroborates defendant's testimony that he was not the initial aggressor. See *Willingham*, 2020 IL App (1st) 162250, ¶ 27 (evidence corroborating the defendant's self-defense claim and contradicting the State witnesses that the defendant fired the first shot was sufficient to qualify as

noncumulative). Defendant's affirmative defense of self-defense, if established, would have exonerated him of first degree murder. *See People v. Eveans,* 277 Ill. App. 3d 36, 47 (1996) (noting self-defense is a justifying and exonerating circumstance).

¶ 41 Finally, we find the affidavits place the trial evidence in a new light. The State's evidence showed defendant, with several other people, approached Brown's vehicle, banged on the hood, and punched and shattered the driver's side window. Defendant hit Brown. Little and Vega both testified that defendant then pulled out a gun and shot Brown twice. Defendant's version of events, by contrast, showed Little and Brown, from their car, made derogatory statements to defendant as he entered the alley where their car was parked. Brown sped up "like he wanted to run [defendant] over" and almost hit defendant. Brown then opened the door and tried to use it to hit defendant, who put his hands up, causing the window to break. Brown grabbed defendant and gripped defendant's neck, while Vega threw him to the ground and hit him. In an attempt to scare Brown, defendant grabbed a gun from his friend Danny and fired twice at Brown.

¶ 42 The affidavits support defendant's testimony that he was not the aggressor, stating the car sped up toward defendant, and the driver opened the door to hit defendant. The affidavits further state the driver put defendant in a chokehold and other man hit him until he fell to the ground. These affidavits corroborate defendant's self-defense claim, placing the trial evidence in a new light, particularly given the trial court's explicit rejection of defendant's version of events.

¶ 43 Although the affidavits contradict Little's and Vega's testimony regarding the events leading up to the shooting, "the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Robinson*, 2020 IL 123849, ¶ 60. To be positively rebutted, it must be "clear from the trial record that no fact finder could ever accept the

truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.* In this case, the record does not affirmatively demonstrate that a trier of fact could never accept the veracity of Vasquez's and McAtee's affidavits. Moreover, the new evidence is not required to be "entirely dispositive to be likely to alter the result on retrial." *Robinson*, 2020 IL 123849, ¶ 48. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 44 Thus, because we find defendant has satisfied the pleading requirements for obtaining leave to file a successive postconviction petition, his claim of actual innocence must be advanced to second stage proceedings under the Act. See *id.* ¶ 85 ("the only issue presented in this case is whether [the defendant] may file his successive postconviction petition that alleges he is actually innocent of the crimes for which he has been convicted and sentenced"). Accordingly, we reverse the judgment of the circuit court and remand the cause for further proceedings under the Act.

¶ 45 Reversed and remanded.