NOTICE
Decision filed 01/21/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220475-U

NO. 5-22-0475

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cumberland County. |
| | ) | |
| v. | ) | No. 21-CF-50 |
| | ) | |
| KEITH R. MYERS, | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice McHaney and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence, where alleged prosecutorial misconduct did not amount to first-prong plain error or cumulative error, and defense counsel did not render ineffective assistance of counsel.

¶ 2    Following a jury trial in the circuit court of Cumberland County, defendant, Keith R. Myers, was convicted of domestic battery (720 ILCS 5/12-3.2(b) (West 2020)) and sentenced to five years in prison with four months' mandatory supervised release. Defendant appeals, requesting that this court vacate his conviction and remand for a new trial. Defendant specifically argues that several instances of alleged prosecutorial misconduct amounted to plain error. Alternatively, he contends that the cumulative effect of all prosecutorial errors denied defendant his right to a fair trial. Defendant also argues that defense counsel rendered ineffective assistance of counsel. For the following reasons, we affirm.

1

¶ 3                                    I. Background

¶ 4      We limit our recitation to those facts relevant to our disposition of this appeal. We recite additional facts in the analysis section as necessary to address defendant's specific arguments.

¶ 5      On September 7, 2021, the State charged defendant by information with domestic battery, a Class 4 felony, alleging that defendant, an individual with a prior conviction of domestic battery (13-CF-63), on or about September 6, 2021, knowingly and without legal justification caused bodily harm to the victim, Amanda Montgomery, a family member or household member of defendant. The State attached a police report indicating that Officer Trevor Easton of the Cumberland County Sheriff's Department responded to the residence of Peggy and Chris Cummins on September 6, 2021, in Hidalgo, Illinois, for a domestic in progress. When Officer Easton walked up to the second floor of the Cummins's home, he saw defendant naked with blood on his body and a few scratches on his chest and cheek. Officer Easton also observed Amanda sitting in a chair bleeding from her swollen face with fresh bruises and cuts. According to Amanda, her and defendant had sex, but she made him stop because it hurt. Following her request, defendant got out of bed and proceeded to go through Amanda's phone. As Amanda started to get dressed, defendant hit her "with a closed fist, shoving her down, and bouncing her head off the floor." According to Amanda, defendant hit "her with everything over and over." Officer Easton handcuffed defendant, at which time defendant stated to Amanda, " 'I should've killed you and myself.' " While at the Cumberland County jail, Officer Cody Walters heard defendant say that "he should have killed Amanda Montgomery."

¶ 6      On September 7, 2021, defendant refused to attend his bond hearing. With defense counsel, Attorney Shon Park, present for purposes of defendant's bond hearing, the trial court vacated Attorney Park's appointment until defendant requested counsel. The court entered a no-contact

order and set bond. Following defendant's September 13, 2021, request for counsel, Attorney Park filed an entry of appearance. Attorney Park then filed a motion for discovery, which included a request for, *inter alia*, "[a] copy of any and all DVDs that depict the arrest of the Defendant or of the Defendant's condition at the time of arrest, or at booking."

¶ 7     On September 17, 2021, the State filed an amended information charging defendant with both domestic battery, as stated above, and aggravated domestic battery (720 ILCS 5/12-3.3 (West 2020)), a Class 2 felony, alleging that defendant knowingly and without legal justification caused great bodily harm to Amanda, a family member or household member of defendant.

¶ 8     On October 14, 2021, Attorney Park filed a subpoena for production of documents pursuant to Illinois Supreme Court Rule 204(a)(4) (eff. July 1, 2014), requesting the Cumberland County Sheriff's Department produce all copies on or before October 7, 2021, of cameras or dash cameras, defendant's booking video, and jail footage pertaining to defendant "from September 6, 2021, to September 7, 2021, ending at midnight."

¶ 9     On October 25, 2021, the trial court held a pretrial hearing regarding Attorney Park's subpoena for production of documents. At that time, the Cumberland County Sheriff's Department had failed to produce the requested video footage.

¶ 10     On October 28, 2021, Attorney Park filed a petition for indirect civil contempt, requesting the trial court find Sheriff Steve Maroon in indirect civil contempt of court for willfully failing and refusing to comply with Attorney Park's subpoena for production of documents. In addition, Attorney Park stated that Sheriff Maroon represented to the trial court that defendant refused to get dressed for his bond hearing, which defendant denied.

¶ 11	On November 1, 2021, the trial court held a hearing on Attorney Park's petition for indirect civil contempt.[1] At the hearing, Sheriff Maroon testified that his office "ha[d] some video" downloaded, acknowledging that his office had failed to fully comply with Attorney Park's subpoena. Sheriff Maroon also testified that his office's internal system had technical limitations, which limited their ability to properly and timely record all of the information Attorney Park requested. Sheriff Maroon testified that his office requested an outside company to perform the recording; however, the company did not respond. Moreover, Beth Long, an administrative assistant at the Cumberland County Sheriff's Department, testified that she attempted to comply with the subpoena; however, due to the requested volume, she could not process the recordings fast enough. Ms. Long testified that she contacted Attorney Park's office to request more specificity as to the September 7, 2021, recording, given that the video contained many hours of defendant sitting in a cell with no activity. However, Attorney Park's office did not respond. Long testified that she recorded "[p]robably about six hours" out of the requested 24-hour time period.

¶ 12	Following testimony, Attorney Park clarified that he "simply sent the subpoena to confirm whether or not Sheriff Maroon's representations to this Court were accurate" that defendant refused to attend his bond hearing. In addition, Attorney Park stated that he sought to confirm numerous statements by defendant at the jail as stated in the police report. Following argument by the parties, the trial court determined that the sheriff's department failed to comply with the subpoena. The court understood that there existed difficulty in "procuring the solid twenty-four hours of video; however, there has been no filings challenging the subpoena as being unduly burdensome, or a fishing expedition, or anything of that nature." The court subsequently ordered

---

[1]Prior to hearing testimony, the State filed an additional charge against defendant for the offense of criminal damage to government supported property, a Class 3 felony, in that defendant, on September 7, 2021, knowingly damaged government property at the Cumberland County jail, with damage that exceeded $500 but did not exceed $10,000. This offense is not subject to this appeal.

a mittimus *instanter* for the State's compliance with Attorney Park's subpoena. The court also stated that Attorney Park's request was "an unusual request in any Petition for Indirect Civil Contempt asking that the contemner be *instanter*, sentenced to county jail, Counsel. And I believe that you are aware of that. And I'm wondering what the production value of this is, today in Court." The court ordered the sheriff's department to comply with Attorney Park's subpoena on or before November 15, 2021.

¶ 13    On November 3, 2021, the State filed a motion to quash subpoena, arguing that Attorney Park's subpoena amounted to a " 'fishing expedition.' " The State also argued that the material requested was wholly unrelated to any issue before the trial court. The court denied the State's motion to quash as untimely.

¶ 14    On November 15, 2021, the trial court held a hearing on Attorney Park's indirect civil contempt motion. The State informed the court that the sheriff's department had "some videos"; however, some video footage had been lost due to the internal system "cycl[ing] off." In response to the State's disclosure, the following colloquy took place between the court and Attorney Park:

> "THE COURT: What are you wanting to do today?
> COUNSEL PARK: Well, I guess, first of all, we need to see what they have. And since it is now—I assume [the State] is representing on behalf of the Sheriff's Department they cannot comply, it may turn into an issue of criminal contempt for this Court since there would be no way to purge themselves at this time of the contempt.
> So[,] what I would suggest is that they make a record of what, what videos they have at this point. We can see what's on there. And if we need to come back for a criminal contempt hearing against the Sheriff for failure to comply with the subpoena, we can."

The State confirmed that the sheriff's department recorded "some video" but failed to comply with Attorney Park's entire request. The court set a status hearing for November 29, 2021.

¶ 15    On November 19, 2021, the State filed a motion *in limine* to admit defendant's prior convictions, including domestic battery and aggravated unlawful restraint (13-CF-63), methamphetamine precursor (08-CF-195), and possession or manufacture of methamphetamine of

5

less than 15 grams (05-CF-111). The State also filed a motion *in limine* to admit facts and evidence surrounding defendant's prior conviction of domestic battery (13-CF-63) against Misty Tincher, pursuant to section 115-7.4 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.4 (West 2020)).

¶ 16    On November 29, 2021, Attorney Park filed a motion to withdraw, which the trial court granted. The court subsequently appointed Attorney Terese Matthews to represent defendant and continued defendant's jury trial. Following the parties' agreement to continue defendant's status hearing, the court held a pretrial hearing on January 3, 2022, at which time the court set defendant's jury trial for May 18, 2022. Attorney Matthews did not pursue the contempt issue following her appointment.

¶ 17    On April 5, 2022, defendant asserted, for the first time, the defense of self-defense. Approximately one month later on May 2, 2022, the trial court held a hearing on the State's motions *in limine*. Following argument by the parties, the court denied the State's request to admit defendant's prior convictions for methamphetamine precursor (08-CF-195) and possession or manufacture of methamphetamine of less than 15 grams (05-CF-111). The court, however, granted the State's motion *in limine* to admit defendant's prior conviction of domestic battery (13-CF-63) "should [defendant] choose to testify."[2] Next, the trial court addressed the State's second motion, which requested to admit facts and evidence of defendant's commission of his prior conviction of domestic battery (13-CF-63) against Misty. The State requested the court admit into evidence two "48-hour affidavits"—the affidavit written by Officer Easton in the instant case and the affidavit written by Officer Woodrum of the Cumberland County Sheriff's Department from 13-CF-63. The

_____

[2]The trial court did not reference defendant's conviction for aggravated unlawful restraint on the record. However, the court specifically referenced the offense of domestic battery in conjunction with the State's motion *in limine* to admit evidence of defendant's commission of other offenses of domestic battery.

6

State informed the court that it planned to call Misty, defendant's girlfriend in 2013, to testify at trial consistent with Officer Woodrum's 48-hour affidavit that reported finding Misty with a stab wound on her left arm after defendant stabbed her with a knife. Misty also had wounds to her face, a bald spot on the back of her head, and complained of rib pain. Police discovered drugs in the residence that later tested positive for methamphetamine. Following argument, the trial court took the matter under advisement. Shortly thereafter, the trial court granted the State's motion to admit facts and evidence of defendant's commission of his prior conviction of domestic battery (13-CF-63) against Misty.

¶ 18     On May 9, 2022, defendant filed a motion to allow evidence of Misty's prior conviction of resisting a peace officer, a Class 4 felony, in Cumberland County (21-CF-55). That same day, the State filed a motion *in limine* to prohibit defendant's hearsay statements and permitting the State to introduce defendant's certified convictions for purposes of impeachment, should defendant choose to testify on his own behalf at trial. Following a hearing that day on the motions, the court, without objection by the State, granted defendant's motion to allow evidence of Misty's prior conviction. The next day, the court granted the State's motion *in limine* to prohibit defendant's hearsay statements.

¶ 19     On May 12, 2022, the State filed a motion *in limine* to admit facts and circumstances surrounding defendant's domestic battery in the instant case. The State believed that defendant would attempt to advance a defense based on the " '[u]se of force in defense of person,' " pursuant to section 7-1 of the Criminal Code of 2012 (720 ILCS 5/7-1(a) (West 2020)), claiming he was justified in the use of force against Amanda because he reasonably believed he needed to defend himself against Amanda's imminent use of unlawful force. As such, the State requested to admit a video of defendant in his holding cell "violently destroying property and making violent

7

comments" beginning at 4:35 a.m. on September 7, 2021. In addition, the State requested to admit a video of defendant violently destroying property by attempting to rip a television off the wall in his cell and making violent comments about Amanda at approximately 9:32 a.m. on September 7, 2021. The State also alleged that at approximately at 9:41 a.m. in the video, defendant stated, " 'Fuck you, you fucking bitch. I swear to god, I fucking swear to god,' then proceeds to beat toilet paper and throw it in the corner, then proceeds to the door of his cell and threatens to break jailer's jaws." As such, the State requested the trial court admit the videos to show defendant's violent character as circumstantial evidence indicative of defendant's intent during the domestic battery against Amanda and to cast doubt whether defendant subjectively believed that the force he exercised was necessary to defend himself against Amanda.

¶ 20　　On May 16, 2022, the parties stipulated to the use of Misty's prior convictions for resisting a peace officer in Cumberland County (21-CF-55), possession of methamphetamine in Douglas County (17-CF-52), and possession of methamphetamine in Moultrie County (17-CF-9). The parties agreed that all convictions would be admitted for purposes of impeachment should Misty testify, and the trial court accepted the parties' stipulation.

¶ 21　　On May 17, 2022, the trial court denied the State's motion *in limine* to admit facts and circumstances surrounding defendant's domestic battery in the instant case, including two videos of defendant in a holding cell on September 7, 2021. Before ruling, the court noted that it had viewed both videos. The court indicated that that one of the videos "was largely audio," and "what [defendant] actually said was largely indiscernible." The court stated that many of defendant's statements "related to what had happened *** regarding [defendant] being beat, being scratched, not any reference to things he did." The court agreed with defense counsel that defendant's behavior (destroying a TV, phone, throwing things in his cell, and threatening correction officers)

8

and statements occurred several hours after the incident with Amanda. In addition, the court noted that defendant's actions could indicate he was upset about being incarcerated, "rather than a continuation of how he was acting at the time of the incident." Although both videos had some relevance to the case, the court found the videos too prejudicial. Accordingly, the court denied the State's motion but reserved ruling on the use of the videos as impeachment evidence.

¶ 22     On May 18, 2022, the trial court held defendant's two-day jury trial. The following evidence was adduced.

¶ 23     A. Officer Easton

¶ 24     Officer Easton, a deputy at the Cumberland County Sheriff's Department on September 6, 2021, testified to the following. On September 6, 2021, Officer Easton responded to a call for a domestic battery at the residence of Peggy and Chris Cummins. When he arrived, he initially spoke to Peggy "who informed [him] that [defendant] was beating his girlfriend." Officer Easton then went upstairs where he observed defendant standing naked and Amanda sitting in a chair holding a bloody rag to her swollen, bloody face. Amanda confirmed that her injuries were recent. Officer Easton placed defendant in handcuffs, at which time defendant stated to Amanda, " 'I should have killed you and myself.' "

¶ 25     The trial court, without objection by defense counsel, admitted People's Group Exhibits B and C into evidence and published the exhibits before the jury. People's Group Exhibit B included eight images of defendant's room at the Cummins's home. According to Officer Easton, the images depicted the condition of defendant's room when he arrived at the home. Specifically, the images showed a disheveled room with a lamp and wardrobe knocked over "in the struggle" and the bloody rag that Amanda used on her face. People's Group Exhibit C depicted six images of

Amanda's injuries photographed by Officer Easton, which showed a cut on Amanda's ear, a right swollen eye, and a swollen, bloody nose.

¶ 26    On cross-examination, Officer Easton testified that he observed a scratch on defendant's cheek and another scratch on the side of defendant's body when he arrived at the Cummins's home. Officer Easton did not recall that defendant had blood on, or an injury to, his lower leg. Officer Easton confirmed that defendant made the statement to Amanda as stated above. Officer Easton did not witness the altercation between defendant and Amanda.

¶ 27    B. Officer Cody Walters

¶ 28    Officer Walters, a correctional officer at the Cumberland County Sheriff's Department in September 2021, testified to the following. Specific to September 6 and 7, 2021, Officer Walters completed defendant's booking process, at which time defendant "mumbled under his breath [that] he should have fucking killed the victim." Officer Walters clarified that defendant did not state the word victim but referred to the victim as a "bitch." The following colloquy took place:

> "Q. [THE STATE]: Now there is audio/video of the booking room, is that correct?
> A. Yes.
> Q. And you have reviewed *** that audio and video?
> A. I have.
> Q. And were you able to determine from that audio/video where it was that [defendant] made that statement?
> A. I did not.
> Q. Okay. But as you sit here today, you're sure that *** your independent recollection is [defendant] making that statement?
> A. Yes."

¶ 29    On cross-examination, Officer Walters testified that he did not recall seeing scratches on defendant's cheek or face during the booking process. Officer Walters viewed defendant's two booking photos, noting that there appeared to be "a couple scratches" on defendant's chest (Defendant's Exhibit 1) but no scratches on defendant's face or left cheek (Defendant's Exhibit

2). The trial court, without objection by the State, admitted the exhibits into evidence and published the exhibits before the jury.

¶ 30    On redirect examination, Officer Walters testified that he spent approximately one hour with defendant during the booking process. Officer Walters indicated that defendant never complained of injuries or scratches to his face and body.

¶ 31    C. Amanda Montgomery

¶ 32    Amanda testified to the following. Amanda testified that she was 5'5" tall and weighed 123 pounds. Amanda and defendant began dating in April 2021. Specific to September 6, 2021, Amanda visited defendant at the Cummins's house at 9:15 p.m. When Amanda arrived, she and defendant sat in the living room with Chris before they went upstairs to defendant's "make-shift apartment." Once upstairs, Amanda and defendant engaged in sexual intercourse. While having sex, Amanda experienced back pain and "asked [defendant] for a break." Amanda clarified that she had a back injury that never healed, despite three back surgeries and a pain pump on her side. During the break from sex, defendant started to look through photographs on Amanda's phone. Amanda testified to the following:

> "I could tell that his attitude kind of changed a little bit[,] so I got up and put my clothes on, and he asked where I was going. And I said home. And he started screaming, 'That's all you do is ever go home.' I sat down on the futon to put my shoes on. And when I lifted my head back up, he started hitting my face."

Amanda admitted that, as defendant hit her in the face, she grabbed defendant's genitals for a couple of seconds and kicked him in the stomach to get him off of her. However, defendant continued to hit her. Defendant then "pushed [her] all the way back on the futon and grabbed [her] by the neck." As Amanda attempted to escape, defendant "grabbed [her] by [her] hair and threw [her] down on the plywood floor *** [a]nd he bounced [her] head off the floor a couple times."

11

As Amanda tried to get off the floor, defendant "threw [her] through a mesh cabinet" or a white wardrobe closet. The following colloquy took place:

> "Q. [THE STATE]: Okay. And after he threw you through the wardrobe, what happened?
> A. I started to get up to go sit in the brown chair, and he kept hitting my face. And at this time Peggy Cummins was up there. I finally got to the chair. He came over to me and picked up a wash cloth and started wiping my face. And he said, 'Look how beautiful you are. Look what you made me do to you.'
> Q. Was he saying anything else about infidelity?
> A. He was rambling about infidelity.
> Q. Accusing you of cheating on him?
> A. He always thought that."

Amanda testified that she received medical care at Sarah Bush Lincoln Hospital following the incident, where she underwent multiple CT scans. She experienced pain in her nose, tailbone, and back for weeks following the incident.

¶ 33 Amanda acknowledged that she and defendant had several arguments in the past before the September 6, 2021, incident, and that some arguments turned physical. Amanda discussed an incident in April 2021 when defendant yelled at Amanda's 16-year-old daughter on the phone, which prompted Amanda to drive to defendant's home. At that time, defendant wore Amanda's class ring on a chain around his neck. Amanda grabbed the class ring from around defendant's neck and broke the chain. Amanda apologized and replaced the chain. Defendant did not sustain any injuries during this incident. Amanda then discussed a second incident in April 2021 when she smacked defendant on the cheek after he told her to "take [her] cunt ass home." Defendant, again, did not sustain any injuries during this incident. Later in June 2021, Amanda attempted to leave defendant's home, but "[t]hings got heated. He shoved me. I shoved him. He shoved me down to the ground. And again[,] I grabbed his genitals for a quick second." Defendant, again, did not sustain any injuries during this incident.

12

¶ 34    On cross-examination, Amanda admitted that she was the physical aggressor during both incidents in April 2021. With regard to the June 2021 incident, she testified that defendant "shoved me to the floor. That was self defense." Amanda did not recall scratching defendant's face or his chest on September 6, 2021, and she thought she kicked his stomach but acknowledged that "[m]aybe it was the leg." On redirect examination, the trial court, without objection by defense counsel, admitted and published to the jury People's Group Exhibit D, which depicted four photos showing bruising and injuries to Amanda's chest, the left side of her face, left ear, and her right swollen, bruised eye.

¶ 35    D. Peggy Cummins

¶ 36    Peggy testified to the following. In September 2021, defendant lived in a makeshift apartment on the second floor of her home. Sometime after 11 p.m. on September 6, 2021, Peggy, who was asleep in bed, heard female screams. Once Peggy went upstairs to defendant's apartment, she saw Amanda on the floor with blood on her nose and defendant standing over her yelling "[s]omething about cheating." Peggy testified that she saw Amanda "try to get up, and [defendant] did push her back down and told her that she would get up when he told her to get up." On cross-examination, Peggy acknowledged that she did not see defendant strike Amanda at any time. She, however, confirmed that she saw defendant push Amanda.

¶ 37    Following Peggy's testimony, the State advised the trial court that it had not received a return on Misty's subpoena. The State informed the court that Misty did not show up to court that day and did not anticipate that Misty would show up to testify the next day.

¶ 38    On May 19, 2022, the trial court held the second day of defendant's jury trial, and the following evidence was adduced.

13

¶ 39    E. Dr. Brent Weber

¶ 40    Dr. Weber, an emergency room physician at Sarah Bush Lincoln Hospital, testified to the following. On September 7, 2021, Amanda informed Dr. Weber that her boyfriend assaulted her. According to Dr. Weber, Amanda had "pretty severe facial trauma, a lot of bruising[ ] to the face, eyes, nose, some bruising to the neck, bruising to the chest, complained of some back pain." Dr. Weber ordered five CT scans (*i.e.*, brain, face, neck, chest, as well as abdomen and pelvis) that showed Amanda suffered "a lot of soft tissue edema to the face from bleeding, and *** a broken nose *** [with] some deviation of the septum on the nose."

¶ 41    On cross-examination, Dr. Weber testified that Amanda took multiple medications on September 7, 2021, for anxiety, seizures, reflux, attention deficit hyperactivity disorder, and sleeping issues. Dr. Weber agreed that it was possible that Amanda "took several medicines that [could] affect [her] ability to make [good] judgment"; however, he clarified that this would depend on how long a person took the medications and something to consider on a "person-to-person" basis. Following Dr. Weber's testimony, the State rested. Defense counsel moved for a directed verdict on count II—aggravated domestic battery, and the trial court denied defendant's motion.

¶ 42    F. Defendant

¶ 43    Defendant testified to the following on his own behalf. On September 6, 2021, defendant rented an apartment from Peggy and Chris Cummins. Defendant testified that Amanda, his girlfriend at the time, visited him at his apartment on September 6, 2021. When she arrived that evening after 9 p.m., defendant met her at her vehicle and the two talked to Chris in the living room for 30 minutes. Defendant and Amanda went upstairs and had sexual intercourse, but Amanda asked to take a break due to her back issues. According to defendant, he had no issue with Amanda's request to stop having sex. Shortly thereafter, defendant and Amanda looked at

14

photographs together on Amanda's phone when defendant "questioned" Amanda about another male. The following colloquy took place:

"Q. [DEFENSE COUNSEL]: Okay. Did seeing that picture make you feel angry?
A. Not necessarily. The response I was given was, 'That's Cody Day, and he's just kind of always been around' was precisely what she said.
Q. Did you question her any more about the picture or the person?
A. Oh, no, I did not.
Q. Why is that?
A. Well, it's my past experience with Amanda you don't question anything that she says. If you try to engage her in any kind of explanation, she becomes angry, violent. She shuts down immediately, will not discuss anything she doesn't want to discuss with you."

According to defendant, Amanda became agitated, stood up, and got dressed. Amanda then asked defendant for her phone, and he complied. She then informed defendant that she was going home. According to defendant, "at that point I took my left hand. I placed it on her right shoulder. I said, 'Honey, don't leave.' I have been through this with her before." Amanda then "smacked [defendant's] hand off of her shoulder" and said, " 'I'm fucking going home.' " Defendant testified that he calmly responded to Amanda, stating, " 'Honey, if you want to go home, that's fine. If you walk out, I don't want to hear from you again.' " Amanda then hit defendant on the side of his face. Defendant backed up, stating that she "[k]ind of caught [him] off guard." Amanda started assaulting defendant, which caused defendant to bump into a mirror that fell to the ground. Defendant tried to restrain Amanda's left hand, which caused her to become "more angry and more violent." Amanda then took her right hand, grabbed defendant's face, and dug her nails into his face. Defendant responded by smacking her right hand away. Amanda also kicked defendant's right shin. Defendant then rolled up his pant leg to display to the jury the scar on his right shin. Defendant testified that his right shin hurt and bled after Amanda kicked him on September 6, 2021.

¶ 44    Next, defense counsel discussed Amanda's injuries. The following discussion took place:

15

"Q. [DEFENSE COUNSEL]: [Defendant], you have seen the photos of Amanda's injuries to her face?

A. I have.

Q. Can you tell us how those injuries were caused?

A. So those injuries were sustained on my part as a result of her kicking me. I did not assault her at all. I never have.

Q. Tell us exactly what happened that caused the injuries to her face. What did you do?

A. I struck her with my left hand. She was kicking me and wouldn't stop, and I continued to tell her, 'Please just stop.' And just infuriated her more really, which was common in these events."

Defendant testified that Amanda had unpredictable behavior and assaulted him for no reason. According to defendant, Peggy entered the apartment when Amanda was sitting in the chair at the table. Defendant stated that his booking photos showed two scratches on the side of his face and two or three scratches on his chest.

¶ 45    Defendant also testified that Amanda suffered from mood swings that caused her to become distant, angry, violent, and irritable. Similar to September 6, 2021, Amanda became physically aggressive towards him in April 2021 when she "sucker punched" him for "absolutely no reason." Approximately 10 days later, Amanda assaulted defendant when she "grabbed [him] by the shirt collar, pulled [him] around the room, completely surprised [him], absolutely unprovoked." During this incident, Amanda took her class ring from defendant. Defendant denied initiating either incident. Defendant also testified that Amanda grabbed his testicles in May 2021. Again, he denied that he physically assaulted her on that occasion. Defendant testified that Amanda was the aggressor on September 6, 2021, and that the three prior physical altercations weighed on him and affected his response to Amanda on the night at issue. Defendant admitted to a prior conviction for felony domestic battery in Cumberland County (13-CF-63). Defense counsel asked defendant how he felt when he saw the photos of Amanda's injuries, and defendant responded: "It upsets me

16

naturally. *** [I]t's kind of disturbing. It upsets me to see that it actually came to that when I tried so hard to prevent that from happening on several occasions."

¶ 46   On cross-examination, defendant testified that he was 5'9" tall and weighed 175 pounds, roughly 4 or 5 inches taller and 50 pounds heavier than Amanda on September 6, 2021. Defendant testified that Amanda's kick to his right shin caused him to react. Defendant admitted that he did not complain about his leg injury or have trouble walking when he was arrested because he "did not want [Amanda] to go to jail." He also stated that he never filed police reports after Amanda's prior assaults because he wanted to protect her. Defendant admitted that he never sustained any physical injuries from Amanda in April, May, and June 2021. Defendant denied intentionally causing injuries to Amanda's chest or beating her head off the floor. He believed, however, that she cut her ear "from a strike from my right hand, open palm, to the side of her head." Defendant admitted that he "pushed" Amanda into the wardrobe. The following conversation took place:

> "Q. [THE STATE]: All in self defense?
> A. No. I won't say that was self defense. I acted in a manner to where I was keyed up. My blood was pumping. My ears ringing. Adrenaline was flowing. She stood up from the chair rather quickly. I just pushed her. I pushed her a little bit hard. I regret it. and she's not that stable on her feet. I think that might have played a part. And I just pushed her. I wasn't sure what she was going to do. She's attacked me multiple times. She attacked me on this night just prior to that[.] ***
> * * *
> Q. You felt like you needed to push her down, right?
> A. I felt like it was possibly a threat with her standing out of the chair, standing out of the chair the way she did, yes, sir."

Defendant then admitted that he struck Amanda on September 6, 2021, three times, clarifying that he did not punch her but struck her with the palm of his hand. Defendant stated that he did not intend to hit her in the nose and eye, but Amanda "turned her head towards [his] hand, and [he] was unable to stop, and it struck her nose." When asked if it was her fault, he responded: "It was

17

an *** an unfortunate set of events that I believe we are both responsible for. I feel a certain degree of responsibility for that, yes, sir."

¶ 47 Defendant testified that he initially acted in self-defense when Amanda hit him, "[a]nd it ended [with him] attempt[ing] to prevent *** her from attacking [him] further." Because Amanda refused to stop kicking him, defendant felt the level of force that he used was necessary to protect himself. Defendant testified that it did not cross his mind to leave his apartment, noting that he was nude and did not feel he could turn his back on Amanda. The State then asked defendant the following:

> "Q. [THE STATE]: Then you told Officer [Easton] whenever he was handcuffing you that you should have fucking killed the bitch, isn't that right?
> A. I don't recall, but it's possible.
> Q. You told Officer Walters the same thing?
> A. I don't recall, but it's possible."

Defendant denied that he was angry after he saw a photograph of another male on Amanda's phone. He stated that he felt "hurt, a little bit upset. Angry, no." He testified that he was "[n]ot super calm, but not aggressive at all." The State then asked the following:

> "Q. So when Amanda and Peggy both testified you were yelling at Amanda about cheating on her, that's not what you were mad about that night?
> A. No, sir.
> Q. Okay. Were you yelling at her about cheating on you?
> A. I don't recall.
> Q. And you expect the Jury to believe your rendition of events, and that's even though you were convicted in 2015, felony domestic battery, and you were convicted of felony unlawful restraint, is that right?
> COUNSEL MATTHEWS: Objection, asked and answered. Improper impeachment.
> THE COURT: Sustained.
> [THE STATE]: I haven't asked and answered that, Judge.
> THE COURT: Did I rule on the objection, Counsel?
> [THE STATE]: You did, Judge.
> Q. [THE STATE]: So you do have prior convictions, correct?
> A. Yes, sir.
> Q. Those prior convictions are for felony domestic battery?

18

[COUNSEL MATTHEWS]: Objection, improper impeachment, asked and answered.
THE COURT: Sustained."

Defense counsel immediately asked for a side bar. The trial court reiterated that the State's question regarding defendant's prior conviction amounted to improper impeachment, noting that proper impeachment would include presenting a certified copy of the conviction. The State argued that, even though defense counsel asked defendant about the prior conviction, the State "get[s] to ask as well," stating, "It's been objected to and sustained twice." The court then allowed the State to ask the same line of questioning one more time "just [to] the fact that [the conviction] exists." The State then asked, and defendant admitted, that he was convicted in August 2015 of felony domestic battery. The following conversation took place:

"Q. [THE STATE]: But you're still asking the Jury to believe your testimony here today?
A. I can only ask the Jury to weigh the testimony on both sides and just try to come to an agreement fairly. I can't ask them to consider something in the past as an option of evidence, and I would hope that they wouldn't, to be fair.
Q. They shouldn't consider the prior acts that we talked about here today? They should only consider what happened on September 6?
COUNSEL MATTHEWS: Objection, Your Honor.
[THE STATE]: I withdraw the question, Judge. That's fine. No more questions, Judge. No more questions."

¶ 48 Following defendant's testimony, the defense rested. The State advised the trial court that it would call rebuttal witnesses. Following a short recess, defense counsel objected to the State calling Amanda as a rebuttal witness, arguing that Amanda had remained in the courtroom during all witness testimony. The State argued that defense counsel did not file a written motion to exclude Amanda from the courtroom and that Amanda's testimony would not be materially affected by hearing defendant's testimony. Rather, the State asserted that Amanda would provide consistent testimony on rebuttal to her prior testimony but "with some manner of detail regarding

19

[defendant's] statements." The court overruled defense counsel's objection for failure to file a written motion excluding Amanda from the courtroom during witness testimony.

¶ 49    G. Amanda

¶ 50    The State called Amanda as a rebuttal witness, and she provided the following testimony. Amanda denied that she was the initial aggressor on September 6, 2021. The following discussion took place specific to September 6, 2021:

> "Q. [THE STATE]: How did the fight start?
> A. He started it when I sat down to put my shoes on.
> Q. Who struck who first?
> A. [Defendant] struck me first.
> Q. And we have seen some photographs with a couple of scratches on [defendant]. Do you know how those got there?
> A. I can't say for sure. I may have did [*sic*] it in the midst of all of it. But I can't say that I did it for sure.
> Q. Okay. Would it be your testimony here today that you didn't scratch him before he started striking you?
> A. Correct.
> Q. Did you kick him before he started striking you?
> A. No, I didn't.
> Q. Had he struck you, do you know how many times he struck you before you started to defend yourself?
> A. Multiple times. I don't have a number.
> Q. He also stated that he didn't bounce your head off the floor. Is that correct?
> A. No, it is not.
> Q. And did he, in fact, bang your head off the floor?
> A. Yes, when I was trying to escape, and he drug me back."

Defense counsel did not ask any questions.

¶ 51    H. Officer Easton

¶ 52    Next, the State called Officer Easton as a rebuttal witness, and he provided the following testimony. Specific to September 6, 2021, Officer Easton did not notice blood or an injury to defendant's leg, did not take photographs of defendant's alleged leg injury, and confirmed that defendant did not complain of any injuries when Officer Easton arrested him. Officer Easton testified that defendant mentioned scratches on his cheeks, stating that defendant "told [him] he

20

got those scratches from earlier that day when he was in the woods." Defense counsel did not ask any questions.

¶ 53    Following the close of evidence, the parties provided closing arguments, and the jury deliberated. The jury subsequently found defendant guilty of domestic battery and not guilty of aggravated domestic battery.

¶ 54    On July 26, 2022, the trial court sentenced defendant to five years in prison, followed by four years' mandatory supervised release. Defendant did not file any posttrial motions. Defendant filed a timely notice of appeal.[3]

¶ 55                               II. Analysis

¶ 56    On appeal, defendant requests this court vacate his conviction and remand for a new trial. We first address defendant's claims of prosecutorial misconduct. Defendant specifically argues that the State committed multiple errors amounting to first prong plain error, where the State (1) willfully failed to comply with a written, pretrial defense subpoena in violation of Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001); (2) improperly cross-examined defendant about a prior conviction; (3) repeatedly asked argumentative and inflammatory questions while cross-examining defendant; and (4) improperly called Amanda Montgomery as a rebuttal witness.

¶ 57    Defendant admits that defense counsel failed to challenge these issues in a timely posttrial motion. Accordingly, defendant concedes that he forfeited these issues. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (a defendant forfeits review of an issue if he fails to object at trial and raise the issue in a posttrial motion). Defendant, however, argues in his opening brief that forfeiture should be excused under the first prong of the plain-error doctrine. Alternatively, defendant asserts

_____

[3]On August 9, 2022, defendant filed an amended notice of appeal correcting the date of judgment appealed from as July 26, 2022.

that the cumulative effect of the State's errors denied him of his due process right to a fair trial. We cannot agree.

¶ 58    A. Prosecutorial Misconduct

¶ 59    The plain-error doctrine is a narrow and limited exception. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). To obtain relief under the plain-error doctrine, a "defendant must first show that a clear or obvious error occurred" (*People v. Hillier*, 237 Ill. 2d 539, 545 (2010) (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)), and that the evidence was "so closely balanced that the error alone severely threatened to tip the scales of justice against him." *People v. Hartfield*, 2022 IL 126729, ¶ 50. In plain-error review, the burden of persuasion rests with the defendant. *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). "To determine whether the evidence was, in fact, closely balanced, a reviewing court must review the entire record and conduct a 'qualitative, commonsense assessment' of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility." *People v. Williams*, 2022 IL 126918, ¶ 58 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 53).

¶ 60    1. Subpoena

¶ 61    On appeal, defendant argues that "it was critical to determine whether anything was said or done to compel [defendant's statement]" at the jail to Officer Walters that defendant "should have killed Amanda Montgomery." It is undisputed that Attorney Park filed a motion for civil indirect contempt after the Cumberland County Sherriff's Department failed to provide the full video of defendant following his arrest and booking from September 6, 2021, through midnight on September 7, 2021. It is further undisputed that the sheriff's department never fully complied with the request and eventually the internal system recycled over the video. As such, we conclude that clear error in fact occurred in violation of Rule 412(a)(ii) (The State "shall, upon written motion

22

of defense counsel, disclose to defense counsel \*\*\* any written or recorded statements and the substance of any oral statements made by the accused \*\*\*.") and 412(d) (The State "shall perform its obligations under this rule as soon as practicable following the filing of a motion by defense counsel."). Ill. S. Ct. R. 412(a)(ii), (d) (eff. Mar. 1, 2001).

¶ 62    The question then becomes whether this error rises to the level of plain error. After a thorough review of the record, we cannot find that the evidence was closely balanced. Rather, a detailed review of the evidence demonstrates that it overwhelmingly established defendant's guilt beyond a reasonable doubt of domestic battery. Defendant provided self-serving testimony in which he asserted that Amanda was the initial aggressor. He then testified that he became "keyed up," his "blood was pumping," his "ears ringing," and his "[a]drenaline was flowing" after Amanda kicked him in the shin—an alleged injury that defendant testified resulted in a scar. Officer Easton testified, however, that defendant never complained of a leg injury at any point, asked to have photographs of his shin taken, or showed signs of an injury when Officer Easton arrested defendant and escorted him from the residence to Officer Easton's patrol car.

¶ 63    Moreover, while "keyed up," defendant testified that he "pushed [Amanda] a little bit hard" and struck her three times with the palm of his hand. A review of People's Group Exhibits C and D, which the court admitted into evidence and published for the jury, simply does not support defendant's version of events. Rather, the images of Amanda's facial and upper body injuries were extensive. In fact, Amanda had injuries to her ear, a right eye that was both bruised and swollen, and a swollen, bloody nose. In addition, Officer Easton's testimony undermined defendant's testimony that Amanda scratched his cheek and chest, where Officer Easton stated that defendant told him at the Cummins's residence that he scratched his face in the woods early in the day. As such, even without testimony regarding defendant's violent statement during the booking process,

23

the evidence of defendant's guilt was overwhelming. Thus, we cannot conclude that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. Accordingly, defendant is not entitled to relief under the first prong of the plain-error doctrine.

¶ 64    2. Cross-Examination of Defendant Regarding Prior Conviction

¶ 65    Next, defendant argues that the State improperly impeached defendant with his prior conviction of domestic battery on cross-examination, provided that defendant admitted to the prior felony conviction on direct examination. Specifically, defendant, citing *People v. Pitts*, 257 Ill. App. 3d 949, 954 (1994), argues that introducing a prior conviction as impeachment is not allowed if defendant "admits, or 'fronts,' a prior conviction on direct examination." Defendant, again, argues this issue under first-prong plain error.

¶ 66    The rule is clear that impeachment of a defendant should be by means of record of conviction or an authenticated copy. *People v. Madison*, 56 Ill. 2d 476, 488 (1974). When the State improperly impeaches a defendant during cross-examination with a prior conviction, "reversal is not required unless the error has deprived defendant of substantial justice or influenced the determination of his guilt." *Id.* When a defendant testifies on his own behalf, the record of the defendant's prior conviction is not introduced, and cannot be considered, for the purpose of proving the defendant's guilt or innocence of the crime for which the defendant is being tried; rather, it is admissible only for the purpose of discrediting the defendant as a witness. *People v. Cox*, 195 Ill. 2d 378, 384 (2001); see *People v. Nichols*, 235 Ill. App. 3d 499, 509 (1992); *People v. Wilson*, 43 Ill. App. 3d 583, 584 (1976).

24

¶ 67    Here, the State filed pretrial motions *in limine*[4] to admit defendant's prior conviction for domestic battery (13-CF-63), as well as evidence of defendant's commission of this offense against Misty, defendant's former girlfriend, on October 7, 2013. Following a hearing, the trial court granted the State's motions "should [defendant] choose to testify." Notably, Misty never testified. A review of the record indicates that defense counsel asked defendant on direct examination whether he had a prior conviction of felony domestic battery (13-CF-63), and defendant answered in the affirmative. On cross-examination, the State asked defendant two times if he had a prior conviction for felony domestic battery. Defense counsel objected both times on grounds that the line of questioning constituted improper impeachment and had been asked and answered. The trial court twice sustained defense counsel's objections, and defendant did not answer. Following a side bar, the court allowed the State to ask the same line of questioning one more time "just the fact that [the conviction] exists." The State subsequently asked, and defendant admitted, that he was convicted in August 2015 of felony domestic battery (13-CF-63). Defense counsel did not object.

¶ 68    First, we conclude that the trial court cured any error caused by the State's two initial questions concerning defendant's prior conviction when the court sustained defense counsel's objections and instructed the jury at the end of trial to disregard questions to which objections were sustained. See *People v. Hall*, 194 Ill. 2d 305, 342 (Trial court cured any error from State's questioning regarding the defendant's prior conviction by sustaining defense counsel's objection and instructing jury to disregard questions to which objections were sustained.). Second, the jury

[4]As stated in the background facts, the State's motion *in limine* also requested the trial court admit defendant's prior convictions for methamphetamine precursor (08-CF-195) and for possession or manufacture of methamphetamine of less than 15 grams (05-CF-111). The trial court ultimately denied the State's request to admit these two prior convictions.

learned of defendant's prior conviction on direct examination when he admitted to the 2015 conviction for domestic battery. With regard to the State's final question, we agree with defendant that the State's question was improper. Despite this, we cannot find that the State's error deprived defendant of substantial justice or influenced the determination of his guilt.

¶ 69    As detailed above, the jury saw the extensive facial and upper body injuries that Amanda suffered in comparison to defendant's minor scratches and alleged right shin injury. It is reasonable to believe that the jury found defendant's testimony incredible, where he testified that he only struck Amanda three times with an open palm and did not throw her head against the wood floor. Importantly, sufficient evidence established defendant's guilt that he did not act in self-defense. Defendant, himself, testified that he "pushed" Amanda into the wardrobe, and did so when he was *not* acting in self-defense. After this admission, defendant immediately stated: "I acted in a manner to where I was keyed up. My blood was pumping. My ears ringing. Adrenaline was flowing." Defendant stated that he pushed Amanda and struck her multiple times. Based on the foregoing, we cannot conclude that the State's cross-examination of defendant in this instance constituted reversible error, where the evidence was not so closely balanced that the error alone severely threatened to tip the scales of justice against him. Defendant, thus, has failed to demonstrate that he is entitled to relief under the first prong of the plain-error doctrine.

¶ 70    3. Argumentative and Inflammatory Cross-Examination of Defendant

¶ 71    Next, defendant argues that the State's repeated argumentative, irrelevant, and inflammatory questions of defendant on cross-examination amounted to prosecutorial misconduct, where the State's questions served no other purpose than to "inflame the jury's passions and plead to their emotional responses," in violation of Illinois Rule of Evidence 403 (eff. Jan. 1. 2011) ("[E]vidence may be excluded if its probative value is substantially outweighed by the danger of

26

unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Defendant, again, argues this issue under first-prong plain error.

¶ 72 Defendant argues that the State relied on "unnecessarily charged language and misrepresentations of the evidence" to imply to the jury that defendant was out of control. Specifically, defendant challenges the following line of questioning:

"Q. [THE STATE]: So you're telling the Jury that it was the kick to the leg that caused you to beat Amanda that badly?
A. [DEFENDANT]: It was the continuous assault and my attempt to end it.
Q. So you felt like you had to beat her in the face that bad?
COUNSEL MATTHEWS: Objection, Your Honor.
THE COURT: Sustained."

Importantly, defendant testified prior to this discussion that what caused him to react was Amanda's kick to his shin. Defendant also challenges the State's question: "And that's the wooden floor you beat her head off of?" Defense counsel did not object, and defendant denied that he beat Amanda's head off of the floor. However, shortly thereafter, defendant admitted that "if you beat someone's face off the floor, she would receive a broken nose, yeah." Immediately, defendant admitted that he "pushed" Amanda into the wardrobe but not in self-defense, stating:

"I acted in a manner to where I was keyed up. My blood was pumping. My ears ringing. Adrenaline was flowing. She stood up from the chair rather quickly. I just pushed her. I pushed her a little bit hard. I regret it. And she's not that stable on her feet. I think that might have played a part. And I just pushed her. I wasn't sure what she was going to do. She's attacked me multiple times. She attacked me on this night just prior to that[.]"

¶ 73 Shortly after this testimony, the State asked defendant if he beat Amanda on September 6, 2021, "because of some untruths," and defendant denied that he ever beat Amanda. The State followed up: "You didn't cause the injuries that we have seen?" Defense counsel objected on grounds that the questioning was argumentative and asked and answered. The trial court advised the State to rephrase the question, and the State stated, "You struck Amanda Montgomery,

27

correct?" Defendant admitted that he struck Amanda on September 6, 2021, when he struck her three times with an open palm. Defendant also challenges the State's comment, "You did a good job this time, didn't you?" in response to defendant's testimony that he never reacted to Amanda's past assaults on him. Defense counsel objected, asserting that the question was argumentative, and the trial court sustained the objection. Defendant also challenges the State's line of questioning as follows:

> "Q. But you're still asking the Jury to believe your testimony here today?
> A. I can only ask the Jury to weigh the testimony on both sides and just try to come to an agreement fairly. I can't ask them to consider something in the past as an option of evidence, and I would hope that they wouldn't, to be fair.
> Q. They shouldn't consider the prior acts that we talked about here today? They should only consider what happened on September 6?"
> COUNSEL MATTHEWS: Objection, Your Honor.
> [THE STATE]: I withdraw the question, Judge. That's fine. No more questions, Judge. No more questions."

Lastly, defendant challenges the State's comment on recross examination, "You certainly ended it though, didn't you?" in response to defendant's testimony that he was not the initial aggressor on September 6, 2021. Defense counsel objected, asserting that the State's comment was argumentative, and the court overruled the objection.

¶ 74    We disagree with defendant that the challenged statements and comments made by the State were inflammatory. Although we agree with defendant that many of the State's comments and questions were argumentative, we cannot conclude that State's comments and questions amounted to error. Even if we were to consider this error, the alleged errors did not rise to the level of plain error. As stated in great detail above, the evidence was not closely balanced. Defendant proceeded to trial on a self-defense theory; however, he testified that he did not act in self-defense when he became "keyed up," causing him to push Amanda and strike her three times. In addition, Amanda testified that defendant stood over her, refusing to let her stand up while he continued to

28

hit her in the face. In addition, Peggy testified that she heard female screams, prompting her to run to defendant's makeshift apartment. Once Peggy arrived upstairs, she saw Amanda lying on the floor with a bloody nose, and defendant standing over her yelling "[s]omething about cheating." Peggy testified that she saw Amanda "try to get up, and [defendant] did push her back down and told her that she would get up when he told her to get up." Because we cannot conclude that the evidence was closely balanced, defendant has failed to show that he is entitled to relief under the first prong of plain error.

¶ 75    4. Rebuttal Witness

¶ 76    Next, defendant argues that the State erred by calling Amanda to testify as a rebuttal witness, where the State's questions were entirely cumulative, "a waste of time," and failed to introduce new evidence. Defendant also contends that Amanda's testimony "did not rebut anything [defendant] had said except to effectively re-present its case-in-chief." We disagree.

¶ 77    Rebuttal evidence is used to " 'explain, repel, contradict, or disprove the evidence' " presented by the defendant. *People v. Waller*, 67 Ill. 2d 381, 387 (1977) (quoting *People v. Daugherty*, 43 Ill. 2d 251, 255 (1969)). In fact, "[e]vidence offered in rebuttal is admissible if it tends to explain or disprove the testimony of the accused." *People v. Eveans*, 277 Ill. App. 3d 36, 47 (1996). Rebuttal witnesses may repeat portions of their prior testimony provided in the State's case-in-chief, as long as the trial court determines that the evidence helps to explain, repel, or contradict the defendant's case. *People v. Williams*, 223 Ill. App. 3d 692, 699 (1992).

¶ 78    Based on the above principles, we cannot conclude that the State erred. Although many similarities exist between Amanda's testimonies, Amanda admitted on rebuttal, dissimilar to her prior testimony, that she may have scratched defendant on September 6, 2021. She also testified on rebuttal that she scratched and kicked defendant only after defendant struck her first. As such,

29

Amanda's rebuttal testimony contradicted defendant's testimony that she was the initial aggressor. Accordingly, where defendant testified that he only struck Amanda after she kicked him in the shin, suffered multiple scratches on his cheek and chest from Amanda's violent behavior, and only "pushed her a little bit hard," we are unconvinced that Amanda's rebuttal testimony was cumulative or a waste of time. Rather, the evidence offered through Amanda's rebuttal testimony repeated portions of Amanda's prior testimony, while also disproving or rebutting the testimony of defendant, which the jury reasonably found self-serving and incredible. See *Eveans*, 277 Ill. App. 3d at 47-48. Accordingly, where no error exists, defendant is not entitled to relief under the plain-error doctrine.

¶ 79    B. Cumulative Error

¶ 80    Alternatively, defendant argues that the cumulative effect of the State's errors constitutes plain error, excuses forfeiture, and requires the reversal of defendant's conviction under the second prong of the plain-error doctrine. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). In determining whether a defendant was denied a fair trial "we employ the same test that this court uses whenever it applies the second prong of the plain error test." *People v. Blue*, 189 Ill. 2d 99, 138 (2000). In such cases, we ask "whether a substantial right has been affected to such a degree that we cannot confidently state that [the] defendant's trial was fundamentally fair." *Id.* If the answer is to this question yes, reversal will be warranted even in the face of overwhelming evidence of the defendant's guilt. *Id.* at 140. We apply *de novo* review to this question of law. *People v. Graham*, 206 Ill. 2d 465, 474 (2003).

30

¶ 81    While defendant raised four contentions of error, we have concluded that only two of those instances actually constituted clear or obvious error for the purposes of our plain-error analysis. First, we found that error occurred when the Cumberland County Sheriff's Department, and thus the State, failed to fully comply with defense counsel's subpoena to produce documents in violation of Rule 412. We also found error occurred when the State improperly cross-examined defendant, which the trial court allowed, regarding defendant's prior conviction for domestic battery. As analyzed above, neither error amounted to reversible error under the first prong of the plain-error doctrine. Similarly, we cannot conclude that either error amounted to second-prong plain error such that each error was so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process.

¶ 82    In sum, neither of these errors approach reversible error individually. Even when considered cumulatively, the State's errors were not so extreme that defendant received an unfair trial. See *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55 (cumulative errors warranting reversal must be extreme—and no cumulative error exists where the alleged errors do not amount to reversible error on any individual issue). "[A] defendant in a criminal case is entitled to a fair trial, not a perfect one." *People v. Ruiz*, 94 Ill. 2d 245, 260 (1982). Defendant's trial was not perfect. However, the cumulative effect of these two errors did not deprive defendant of a fair trial such that reversal is warranted despite the overwhelming evidence of defendant's guilt. Accordingly, we reject defendant's argument.

¶ 83    C. Ineffective Assistance of Counsel

¶ 84    Lastly, defendant argues that defense counsel rendered ineffective assistance of counsel by failing to (1) follow through with Attorney Park's contempt motion, (2) renew an objection to Amanda's rebuttal testimony, (3) move to strike Amanda's testimony from the record, and (4) seek

31

a *People v. Lynch*, 104 Ill. 2d 194, 199-200 (1984), instruction. We address defendant's contentions in turn.

¶ 85    "In order to succeed on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness (deficiency prong) and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different (prejudice prong)." *People v. Boyd*, 2018 IL App (5th) 140556, ¶ 16 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). "Both prongs under *Strickland* must be satisfied in order to succeed on a claim of ineffective assistance, and the failure to satisfy either prong will be fatal to the claim." *Id.* ¶ 19 (citing *People v. Mack*, 2016 IL App (5th) 130294, ¶ 27). Our supreme court has ruled that the analysis under the closely balanced prong of the plain-error doctrine is similar to the analysis for prejudice under a claim of ineffective assistance of counsel. *People v. White*, 2011 IL 109689, ¶¶ 133-34. Therefore, defendant's claims of ineffective assistance of counsel are meritless regarding the contempt motion and Amanda's rebuttal testimony, where, as here, defendant cannot show that the evidence was closely balanced. Accordingly, defendant cannot show that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different.

¶ 86    Lastly, we address defendant's argument that defense counsel rendered ineffective assistance of counsel by failing to seek a *Lynch* instruction. Defendant raises this issue for the first time on appeal, asking this court to address the issue as proof of ineffective assistance of counsel.

¶ 87    Pursuant to *Lynch*, 104 Ill. 2d at 199-200, a victim's aggressive and violent character may tend to support a defendant's theory of self-defense in two ways. First, a defendant that possesses knowledge of the victim's violent tendencies may necessarily affect his perceptions of, and reactions to, the victim's behavior, and second, evidence of the victim's propensity for violence

32

tends to support the defendant's version of the facts *Id.* at 200. As such, our supreme court held that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *Id.*

¶ 88 Based on the above principles, defendant is correct that defense counsel should have requested a *Lynch* instruction in this case, where evidence existed that Amanda admitted that she was the initial aggressor on two prior occasions in April 2021. Specifically, Amanda testified that she drove to defendant's home, grabbed her class ring from around defendant's neck, and broke the chain. According to defendant, she assaulted him when she "grabbed [him] by the shirt collar, pulled [him] around the room, completely surprised [him], absolutely unprovoked." On a separate occasion in April 2021, Amanda smacked defendant on the cheek after he told her to "take [her] cunt ass home." According to defendant, Amanda "sucker punched" him for "absolutely no reason."

¶ 89 Even assuming that defense counsel's representation fell below an objective standard of reasonableness, we cannot conclude that defendant suffered prejudice, amounting to ineffective assistance of counsel. Importantly, defendant admitted that he was not acting in self-defense when he "pushed" Amanda into the wardrobe, stating: "I acted in a manner to where I was keyed up. My blood was pumping. My ears ringing. Adrenaline was flowing. She stood up from the chair rather quickly. I just pushed her. I pushed her a little bit hard." As stated above, the extensive injuries Amanda suffered, and defendant's lack of injuries, overwhelmingly showed that defendant struck Amanda, pushed her into furniture, and continued to hit her while she was on the ground, according to Amanda and Peggy's testimonies. Even if Amanda had been the initial aggressor, we are unconvinced—apparently similar to the jury—that defendant's response was justified, given the

33

extensive and very visible injuries Amanda suffered to her face and upper body, as well as Amanda and Peggy's consistent testimonies. Contrary to defendant's argument, the evidence does not amount to a "close case." Instead, as stated in great detail above, a detailed review of the evidence demonstrates that it overwhelmingly established defendant's guilt beyond a reasonable doubt of domestic battery. Thus, we are unconvinced that the jury would have acquitted defendant based on his theory of self-defense had defense counsel requested, and the trial court provided, the *Lynch* instruction. Accordingly, defendant's claim of ineffective assistance of counsel is without merit.

¶ 90                                        III. Conclusion

¶ 91      For the reasons stated, we affirm defendant's conviction and sentence for domestic battery.


¶ 92      Affirmed.